

**SO ORDERED.**

**SIGNED this 29 day of July, 2005.**

*Dale L. Somers*
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re:<br><br>JAMES BLAIR KIRBY,<br><br>        DEBTOR. | CASE NO. 03-16858<br>CHAPTER 12 |
| RABO AGSERVICES,<br>in its capacity as servicer for<br>AG ACCEPTANCE CORPORATION,<br><br>        PLAINTIFF,<br><br>v.<br><br>JAMES BLAIR KIRBY,<br><br>        DEFENDANT. | ADV. NO. 04-5080 |

**MEMORANDUM AND ORDER GRANTING
MOTION OF RABO AGSERVICES FOR SUMMARY JUDGMENT**

1

The matter before the Court is the Motion for Summary Judgment filed by Plaintiff, Rabo AgServices. Plaintiff appears by Charles T. Engel and Jason E. Geier, Cosgrove, Webb & Oman. Defendant James B. Kirby, Debtor, appears by Dan W. Forker, Jr., Forker, Suter & Rose. There are no other appearances.[1]

Plaintiff, Rabo AgServices, in its capacity as servicer for Ag Acceptance Corporation, filed a Complaint to Determine Discharge pursuant to 11 U.S.C.A. § 523(a)(4).[2] The debt at issue is the non-payment of postpetition court approved financing extended by the Plaintiff to the Defendant during his prior bankruptcy proceeding, Case No.95-13831, a Chapter 12 case filed on December 29, 1995. Plaintiff alleges that Debtor, while acting in his role as a trustee and a fiduciary in that bankruptcy proceeding, converted collateral securing the debt. For the reasons stated below, the Court grants the Plaintiff's motion and holds that a debt in the amount of $46,554.98 owed by Debtor to Plaintiff is non-dischargeable.

## I. UNCONTROVERTED FACTS.

The following facts stated by the Plaintiff when moving for summary judgment are not controverted by the Debtor:

1. Defendant Kirby is the Debtor in the pending bankruptcy, Case No. 03-16858-12.

2. Debtor previously filed a voluntary petition pursuant to Chapter 12 of the United States Bankruptcy Code on December 29, 1995, Case No. 95-13831 (hereinafter referred to as the "1995

---

[1] This Court has jurisdiction pursuant to 28 U.S.C.A. § 1334 and 28 U.S.C.A. § 157(a). Further, this matter is a core proceeding pursuant to 28 U.S.C.A. § 157 (b)(2)(J).

[2] Future references to the Bankruptcy Code in the text shall be to the section only.

case"). Kirby was granted a discharge in the 1995 case on March 2, 2003, for all debts existing prior to December 29, 1995.

3. On May 9, 2002, during the 1995 case, the Bankruptcy Court entered an order approving Kirby's application to incur indebtedness from Ag Services of America, Inc., in the principal amount of $135,000. On July 17, 2002, the Bankruptcy Court entered a further order increasing the amount of indebtedness to $155,000, and adding 100 acres of Kirby's irrigated corn to the collateral securing the indebtedness.

4. On April 17, 2002, Kirby executed and delivered in favor of Ag Services of America, Inc., a Master Promissory Note in the principal amount of $135,000 due and payable in full before January 15, 2003, together with interest at the rate of 4% in excess of the Prime Rate per annum.

5. On May 15, 2002, Kirby executed and delivered in favor of Ag Services of America, Inc. a certain Agreement to Supplement Master Promissory Note increasing the maximum funds available under the Master Promissory Note to the amount of $135,000. Ag Service of America, Inc. subsequently assigned its interest in the Master Promissory Note and the Supplement Master Promissory Note to Ag Acceptance Corporation.

6. To secure the indebtedness to Ag Services of America, Inc., Kirby on April 17, 2002, executed and delivered in favor of Ag Services of America, Inc., an Agricultural Security Agreement.

7. Pursuant to the Agricultural Security Agreement and Bankruptcy Court orders, Kirby granted Ag Services of America, Inc, a security interest in 100 acres of 2002 irrigated corn and "all presently owned and hereafter acquired 2002 growing crops, farm crops, general intangibles, accounts, accounts receivable, contract rights and warehouse receipts, and insurance with respect to which such

crop inputs relate, together with the proceeds, as well as all federal and state government or agency entitlement programs in which the Debtor (Kirby) currently holds, or subsequently acquires, an interest in which could become to the Debtor (Kirby) during the term of and/or prior to payment in full of the 2002 crop loan provided by Ag Services of America, Inc., as approved herein (including, but not limited to, disaster and deficiency payments), payable in cash, in kind, or otherwise, together with the Debtor's (Kirby) farm machinery and equipment."

8. Ag Services of America, Inc., perfected its security interest in the collateral by filing its UCC Financing Statement with the Kansas Secretary of State on April 29, 2002. Thereafter, Ag Services of America, Inc. assigned its security interest to Ag Acceptance Corporation, and filed its UCC Financing Statement with the Kansas Secretary of State on May 13, 2002.

9. On October 1st, 7th, 18th, and 31st and December 5, 2002, Kirby sold corn and milo which were subject to Ag Services of Americas, Inc.'s lien at Mull Farms and Feeders, Pawnee County, Kansas. Kirby had not listed Mull Farms and Feeders as a buyer of his farm products collateral.

10. The proceeds from the grain sales at Mull Farms and Feeders were in the amounts of $12,000, $4,000, $7002.63, $4,000, $19,015.39, and $536.96 respectively, and none were remitted to Ag Services of America, Inc.

11. Kirby admits that proceeds from the grain sales were not paid to Ag Services of America, Inc. and claims that the proceeds were instead used to pay operating expenses. The amount of such operating expenses listed by Debtor Kirby totaled $24,253.78. The operating expenses listed are $22,301.20 less than the $46,554.98 that Ag Services of America was owed.

4

In addition, the Court finds that the following facts disclosed in the records of the 1995 case and of this case are uncontorverted and relevant to the issues before the Court:

1. The Chapter 12 plan in the 1995 case was confirmed on April 10, 1997. Amendments were entered on October 20, 1998 and January 30, 2002.

2. An order Discharging Debtor in Chapter 12 Proceedings and Discharging Standing Chapter 12 Trustee was entered in the 1995 case on March 2, 2003. It provides in relevant part as follows:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the debtors are hereby released from all personal liabilities for debts existing on the date of the commencement of the case, or deemed to have existed on such date pursuant to 11 U.S.C. § 348(d) except:
> a. Those debts determined nondischargeable by the Bankruptcy Court pursuant to 11 U.S.C.§ 523(a)(2), (4), and (6);
> b. Those debts which are nondischargeable pursuant to 11 U.S.C. § 523(a), (1)(1), (3), (5), (7), (8), and (9) and
> c. Those long term debts as defined under 11 U.S.C. § 1222(b)(5), 11 U.S.C. § 1222(b)(9) & § 1222(b)(10) which are to be continued beyond the plan payment period including the 2002 payment and future payments due to the First National Bank & Trust Company of Larned.

3. The 1995 case was closed on July 21, 2003.

4. This case was filed on a December 19, 2003.

5. Plaintiff filed a proof of claim on April 19, 2004, for $103,933.38 for money loaned and goods sold.

## II. POSITIONS OF THE PARTIES.

Plaintiff Rabo AgServices contends that all of the elements to deny a discharge of its claim pursuant to subsection 523(a)(4) are present. It contends that Kirby as a debtor-in-possession in his 1995 case was serving in a fiduciary capacity when he committed a defalcation by converting the

Plaintiffs' collateral. The Debtor admits that the elements for denial of discharge under subsection 523(a)(4) are present, but argues that only that part of the Plaintiff's claim which is directly traceable to the defalcation should be excepted from discharge. In the alternative, and in complete defense of Plaintiff's Complaint, Debtor argues that Plaintiff's claim is barred by the discharge entered in the 1995 case.

### III. ANALYSIS AND CONCLUSIONS OF LAW.

Subsection 523(a)(4) provides as follows:

> (a) A discharge under section. . . 1228(a), 1228(b). . . of this title does not discharge an individual debtor from any debt -
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

Two elements are required to prevent discharge of the debt: A fiduciary relationship between the Debtor and AgServices; and fraud or defalcation committed by the Debtor in the course of that fiduciary relationship.[3] In the 10th Circuit, a fiduciary relationship exists for purposes of subsection 523(a)(4) only if there is an express or technical trust.[4] "A technical trust may arise as a result of defined obligations imposed upon the debtor by state or federal statute."[5] Under the 10th circuit's bankruptcy case law, "to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor."[6]

---

[3] *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996).

[4] *Id*.

[5] *Cundy v. Woods (In re Woods)*, 284 B.R. 282, 288 (D. Colo. 2001).

[6] *In re Young*, 91 F.3d at 1371.

6

Although fiduciary duty is narrowly defined, defalcation is broadly construed. Defalcation has been defined as the "misappropriation of trust funds or money held in any fiduciary capacity."[7] In an action under subsection 523 (a)(4), defalcation includes innocent as well as intentional or negligent defaults.[8]

In this case, Plaintiff argues that a trust was statutorily imposed on the Debtor pursuant to federal statutory law by virtue of section 1203. That Code section, subject to certain exceptions, clothes chapter 12 debtors in possession with all of the powers, functions, or duties of a trustee serving in a case under chapter 11. A chapter 11 trustee is a fiduciary.[9] Kirby was serving as a debtor-in-possession in his 1995 case when the events in issue occurred. The court orders authorizing the indebtedness and providing that the debt was secured by Kirby's 2002 crop were entered in the 1995 case on May 9, 2002, and again on July 17, 2002. Further, while acting as the chapter 12 fiduciary, Kirby misappropriated the proceeds of collateral entrusted to him. In October and December 2002, during the pendency of the 1995 case, Debtor diverted $46,554.98 of the proceeds from the off-list sale of the 2002 crop, which secured the post petition financing, and spent at least a portion of the proceeds for operating expenses. The Debtor does not controvert the position of the Plaintiff that these acts constituted a defalcation while acting in a fiduciary capacity. The Court finds that the elements for nondischargeability under subsection 524 (a)(4) are satisfied.

---

[7] *Lewis v. Scott ( In re Lewis)*, 97 F.3d 1182, 1186 (9th Cir. 1996), *quoting Black's Law Dictionary* 417 (6th ed. 1990).

[8] *Id.*, 97 F.3d at 1186.

[9] *Mosser v. Darrow*, 341 U.S. 267 (1951); *American Savings & Loan Association v. Weber (In re Weber)*, 99 B.R.1001, 1009 (Bankr. D. Utah 1989). *See In re Leach*, 101 B.R. 710, 713 (Bankr. E. D. Okla. 1989) (recognizing that a chapter 12 debtor in possession has a statutory and fiduciary duty to make distribution to creditors in conformity with the plan).

The issue raised by the Debtor is the question of the extent of nondischargeability. The Debtor contends that only the amount of the loss to the Plaintiff which was sustained as a result of the act of defalcation should be excepted from discharge, and that in this case that amount is $46,554.98, the proceeds from the collateral which were diverted by Debtor. The Plaintiff's position on this issue is not clear.[10] Although Plaintiff's arguments focus upon the act of defalcation and the known amount of the loss, Plaintiff appears to be praying for an order denying discharge for the entire debt of $103,933.38.

The Court holds that the extent of nondischargeability is determined by the amount of the loss caused by the defalcation while acting in a fiduciary capacity. This principle follows from the clear statutory language. Subsection 523(a)(4) provides that a discharge under section 1228 "does not discharge an individual debtor from any debt for . . . defalcation while acting in a fiduciary capacity." It is a particular debt arising from the defalcation while acting as a fiduciary which is excepted from discharge;[11] it is not entire claim of the creditor objecting to discharge. Some courts impose this limitation expressly by including, as an element to be proven by the creditor seeking the exception to discharge, the requirement of proving that a loss was sustained because of defalcation while breaching a fiduciary duty.[12] In some cases, this requirement is implicit in the court's careful examination of the

---

[10] The Plaintiff's Complaint alleges that its claim is comprised of unpaid principal of $89,460.02, accrued interest of $3,548.59 as of May 7, 2003, and legal fees as of that date of $1,856.15. The Plaintiff filed a proof of claim for $103,933.38 for both goods and services and money loaned. It is uncontroverted that the proceeds of the grain which were converted were $46,554.98.

[11] *See American Insurance Co. v. Lucas*, 41 B.R. 923, 925 (D. W.D. Pa. 1984) (stating that subsection 523(a)(4), as well as its predecessor, "require that a debtor be in a fiduciary capacity if a debt created by fraud or defalcation is sought not to be discharged.")

[12] *E.g., In re Webber*, 99 B.R. at 1008 (holding that a ruling favorable to an objecting creditor requires the court to determine that there was a fiduciary relationship, that the individuals are personally liable for breach of the fiduciary duty, that fraud or defalcation occurred, and that the creditor sustained a

8

causes of the loss sustained by the objecting creditor.[13] As stated above, in the 10th Circuit "to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor."[14] This requirement has the result of limiting the amount of the debt excepted from discharge to that caused by the defalcation.

In this case, the Debtor's obligation to Plaintiff is excepted from discharge only to the extent that his defalcation while serving in a fiduciary capacity as debtor in possession in his prior chapter 12 proceeding resulted in a loss to the Plaintiff. The uncontroverted facts establish that the value of the collateral sold by the Debtor and not remitted to the Plaintiff was $46,554.98. Apart from the conversion of collateral, the Debtor's simple failure to timely pay the Plaintiff the full amount owed because of the postpetition financing authorized by the court in 2002 did not arise from a defalcation while acting in a fiduciary capacity. There is no showing that monies in excess of those received from the sale of collateral came into the Debtor's possession for the specific purpose of paying the loan. To the extent that Plaintiff's proof of claim includes debts arising from sale of goods or services or the outstanding balance on loans in excess of the proceeds from the sale of the converted collateral, such claim is not excepted from discharge by subsection 523(a)(4).

Finally, the Court rejects the Debtor's argument that a no portion of the claim of the Plaintiff in this case can be excepted from discharge because the entire debt arising from the postpetition financing

---

loss as a result); *Bombardier Capital Inc.. (In re Black )*, 179 B.R. 509, 513 (Bankr. E.D. Tex. 1995) (holding that a plaintiff in a proceeding under subsection 524(a)(4) must establish that it sustained a loss as a result of the Chapter 11's debtors defalcation while acting as a fiduciary).

[13] E.g., *LaPointe v. Brown (In re Brown)*, 131 B.R. 900 (Bankr. D.Me. 1991).

[14] *In re Young*, 91 F.3d at 1371.

was discharged in the Debtor's 1995 case. This position is simply not supported by the plain language of the Bankruptcy Code or the order of discharge in the 1995 case. The scope a discharge in a Chapter 12 proceeding is set forth in subsection 1228(a), which provides as follows:

> (a) As soon as practical after completion by the debtor of all payments under the plan... unless the court approves a written waiver of discharge..., the court shall grant the debtor a discharge of all debts provided for by the plan allowed under section 503 of this title or disallowed under section 502 of this title, except any debt-
> (1) provided for under section 1222(b)(5) or 1222 (b)(9) of this title; or
> (2) of the kind specified in section 523(a) of this title.[15]

Thus, three categories of debt are discharged: (1) Debts provided for by the plan; (2) administrative expenses allowed under section 503; and (3) claims disallowed under section 502.[16] None apply here. First, the Plaintiff's claim for repayment of the postpetition financing was not provided for by the Debtor's Chapter 12 plan, which was confirmed long before the indebtedness was approved by the court and amended only before the order allowing the borrowing. Second, the Plaintiff's claim was not discharged as an allowed administrative expense. Although the court order approving the postpetition financing provided that if the collateral was insufficient to pay the debt, the creditor would be entitled to "administrative priority in accord with subsections 364(c)(1) and 507(b) for any such deficiency," this provision was merely an authorization for an administrative expense and

---

[15] "The quoted language is difficult to decipher unless one presumes that it contains a typographical error and that a comma should be inserted after the word 'plan.' If the comma is added, it becomes clear that the discharge extends to three categories of debts." 8 *Collier on Bankruptcy* ¶1228.02[3][a] (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 15th ed. rev. 2005).

[16] *Id*.

10

not the allowance of an administrative expense. The allowance of an administrative expense under section 503 requires a request for payment for administrative expense, followed by notice and hearing. All principal and interest on the postpetition financing was due on January 15, 2003, and Debtor was in default several months prior to the closing of the 1995 case. Nevertheless the Plaintiff never sought the approval of its administrative claim under section 503. Third, Plaintiff's claim was never disallowed under section 502. By failing to pursue its remedies in the 1995 case, the Plaintiff gave up its right to payment of its claim on the postpetition financing loan from that bankruptcy estate. However, the claim was not discharged and remained the personal liability of the Debtor after dismissal of the 1995 case.

The order of discharge confirms that foregoing analysis. It does not provide a basis to sustain the Debtor's position. The personal liability discharged by the March 3, 2003, order of discharge is generally limited to "all personal liabilities for debts existing on the date of the commencement of the case or deemed it to have existed on such date pursuant to 11 U.S.C. §348(d)." Plaintiff's debt did not exist on the date of commencement of the case. Plaintiff's debt was not deemed to exist on such date pursuant to subsection 348(d), which deals with claims upon conversion of a case.

## IV. CONCLUSION.

Based upon the foregoing analysis, the Court holds that Debtor's debt to Plaintiff Rabo AgServices for conversion of collateral is excepted from discharge pursuant to subsection 523(a)(4). Debtor committed an act of defalcation while acting as a fiduciary when he sold collateral having a value of $46,554.98 pledged to secure the Plaintiff's debt and converted those proceeds to his own use rather than remit them to Plaintiff. Further, the Court finds that the Debtor's obligation to the Plaintiff for conversion of the collateral was not discharged in the 1995 case.

**IT IS SO ORDERED.**

### ###